1
2
3
4

**UNITED STATES DISTRICT COURT**

5

**DISTRICT OF NEVADA**

6

* * *

7   INTERNATIONAL MARKETS LIVE, INC.,          Case No. 2:22-cv-00077-RFB-DJA
    a New York corporation dba
8   iMARKETSLIVE,                                          **ORDER**

9                        Plaintiffs,

10        v.

11   MATTHEW THAYER,

12                        Defendant.

13

14   **I.      INTRODUCTION**

15

16        Before the court are two motions: Plaintiff International Markets Live, Inc.'s Motion for a

17   Temporary Restraining Order and Defendant Matthew Thayer's Motion to Dismiss for lack of

18   Personal Jurisdiction.  ECF Nos. 42, 45.

19        For the following reasons, the Court grants the motion to dismiss, and does not have

20   jurisdiction over Plaintiff's temporary restraining order.

21

22   **II.     PROCEDURAL BACKGROUND**

23

24        On January 14, 2022, Plaintiff filed a complaint against Defendant.  ECF No. 1.  This

25   complaint stated that the parties both resided in Nevada.  Id.  On January 21, 2022, Plaintiff filed

26   an ex-parte motion for a temporary restraining order.  ECF No. 5.  This Court directed Plaintiff to

27   serve Defendant with its papers by January 31, 2022.  ECF No. 7.  A hearing was set for February

28   11, 2022.  ECF No. 9.  On February 11, 2022, the parties consented to continue the hearing as Mr.

1    Thayer had only recently retained counsel and been served with the summons and complaint.  ECF

2    No. 10.  The stipulation specified that jurisdictional defenses were preserved.  Id.  Mr. Thayer filed

3    his first motion to dismiss on March 1, 2022, arguing the Court did not have jurisdiction over him.

4    ECF No. 13.  On April 5, Plaintiff filed its response.  ECF No. 20.  On May 3, 2022, Defendant

5    filed a reply to Plaintiff's response to Defendant's motion to dismiss.  ECF No. 26.

6         On May 26, 2022, Plaintiff filed a motion for leave to amend its complaint, presumably to

7    correct jurisdictional errors about the parties' respective residences.  ECF No. 32.  The Court held

8    a hearing on June 6, 2022, on Defendant's motion to dismiss.  ECF No. 33.  After the hearing, the

9    Court directed the parties to "meet and confer to discuss whether . . . jurisdictional discovery or an

10   evidentiary hearing to determine jurisdictional facts will be necessary."  ECF No. 33.

11        On June 6, 2022, a hearing was held and Plaintiff's motion for leave to amend its Complaint

12   was granted, and Plaintiff filed its amended complaint the same day.   ECF Nos. 33-34.  On June

13   20, 2022, the parties requested, and the Court granted additional time for the parties to determine

14   if jurisdictional discovery was necessary.  ECF No. 36.  Plaintiff's counsel indicated he needed an

15   additional week and a second stipulation for additional time was signed by the parties and so

16   ordered by the Court on June 27, 2022.  ECF No 37.

17        On July 8, 2022, the parties determined that a "2022 Policies and Procedures" contract did

18   not exist between the parties and could not be a basis for any of Plaintiff's claims. The parties

19   requested leave for Plaintiff to file a second amended complaint to correct the same. ECF No. 39.

20        On August 1, 2022, Plaintiff filed a second amended complaint, the operative complaint in

21   this proceeding.  ECF No. 41.

22        On August 5, 2022, Plaintiff filed a motion for a temporary restraining order.  ECF No. 42.

23   This Motion was substantially similar to its earlier ex-parte motion, save that Plaintiff included

24   facts about Defendant's new employment as an executive officer of one of its competitors. On

25   August 15, 2022, Defendant filed a motion to dismiss the second amended complaint and a

26   response to Plaintiff's motion for a temporary restraining order.  ECF Nos. 45, 48.  On August 17,

27   2022, the Court held a hearing on Plaintiff's temporary restraining order and ordered the parties to

28   supplement their briefing based on the matters discussed at the hearing.  ECF No. 50.  On August

22, 2022, Defendant supplemented his response to Plaintiff's temporary restraining order.  ECF No. 51.  On August 24, 2022, Plaintiff supplemented his reply.  ECF No. 52.

On August 29, 2022, Plaintiff and Defendant stipulated for an extension of time for Plaintiff to respond to Defendant's motion to dismiss, which the Court granted.  ECF Nos. 53-54.  On September 1, 2022, Plaintiff responded to Defendant's motion to dismiss.  ECF No. 55. On September 8, 2022, Defendant submitted its reply. ECF No. 56.

### III.     FACTUAL ALLEGATIONS

In its second amended complaint Plaintiff alleges the following: Plaintiff IML is a company that educates customers about how to trade foreign and crypto currencies. Its customers use their subscriptions to Plaintiff's services to access this educational and research content. IML contracts with Independent Business Owners (IBOs) to "effectuate the direct sales model of its products and services."

To become an IBO, an individual must enter into four different agreements with Plaintiff, and must "click boxes" certifying that they agree to comply with all listed terms.  Pursuant to these four agreements ("IBO agreements"), IBOs agree to "not engage in cross-line sponsoring, solicitation of competing services, unhealthy competition, or unethical business practices." They also agree to a confidentiality clause that requires them for a period of one year from termination of the IBO agreements, to not use information in confidential business reports to which they have access other than promoting "IML business." The confidentiality clause also prohibits the "[u]se or disclos[ure] to any person or entity any confidential information contained in the reports, including the replication of the genealogy in another network marketing company."   Upon termination, pursuant to these terms, the IBO further agrees to return all copies of confidential information in their possession to Plaintiff.

On or about February 6, 2018, Defendant entered into an IBO agreements with Plaintiff, agreeing to these terms and conditions.  The complaint states that the operative version of the IBO agreements went into effect on June 22, 2021, and controls in the event of conflicting terms. The 2021 amended IBO agreements included "restrictive covenants" that prohibited a terminated or "expired" IBO from soliciting any customer/member of Plaintiffs, to whom the IBO had marketed products and or services for the prior two years, to move their business or purchase similar products that were not Plaintiff's. To sidestep this provision, an IBO would have to receive express permission in writing from Plaintiff.  The choice of forum and law clause in the 2021 amended IBO agreements was set to Nevada, and specifically, Clark County.

On or about January 27, 2020, Defendant entered into a second set of agreements, hereinafter the "Educator agreements."  The terms agreed to include a Code of Ethics clause, a noncompete clause, and a non-solicitation clause.

In September of 2021, after a compliance audit on all educators, Plaintiff found Defendant was violating the 2021 amended agreements by promoting overseas brokers unaffiliated with Plaintiff.  Another company admitted that Defendant was actually on their payroll, and that his "account" with Plaintiff was "fake, for marketing use only."  Defendant, after direct questioning from Plaintiff, admitted that his account was fake, and that he accepted commissions from international brokers. Plaintiff immediately terminated Defendant, after the parties' conversation, and asked Defendant to remove any mention of Plaintiff or his former educator status from all sites including social media accounts. Despite this, Defendant continued to market himself as a former "IML educator." Plaintiffs alleges breach of contract, misappropriation and violation of the Uniform Trade Secrets Act, Defamation Per Se, fraud, and various tortious interference claims. Plaintiffs seek both damages and injunctive relief.

1

2     On August 5, 2022, four days after filing the Second Amended Complaint, Plaintiff filed a motion

3     for a Temporary Restraining Order.  In its motion, Plaintiff alleges that Defendant persists in

4     breaching his noncompete and non-solicitation obligations under the IBO agreements.

5

6             Although earlier in the year, Plaintiff moved for a temporary restraining order to prevent

7     Defendant from breaching these agreements through his business, "Matty Pips," it revised its

8     allegations as it learned Defendant was drawing customers and members to a new company,

9     "Driven Trading."  Plaintiff's business is irreparably harmed by Defendant's conduct. Plaintiff

10    asks the Court for injunctive relief, in three forms: "[R]estrain[ing] Defendant from (1) continued

11    breach of the Non-Compete Agreement (2) bribing, soliciting, recruiting or enticing IML IBOs,

12    customers, and traders during the period of the Non-Compete; (3) and misappropriating Plaintiff's

13    trade secrets, confidential corporate information, and other proprietary information." At the

14    hearing held on August 17, 2022, Plaintiff represented that the noncompete clause in the parties'

15    agreements would expire on September 21, 2022.

16

17

18

19        **IV.    LEGAL STANDARD**

20

21        **Motion to Dismiss**

22            A plaintiff bears the burden of establishing personal jurisdiction. Tuazon v. R.J. Reynolds

23    Tobacco Co., 433 F.3d 1163, 1168 (9th Cir. 2006).  A Federal District Court has personal

24    jurisdiction over a nonresident-defendant when she has either continuous and systematic contact

25    with the forum state (general jurisdiction) or when the suit in question arises out of a minimum set

26    of purposeful contacts with the forum state (specific jurisdiction).  See generally Helicopteros

27    Nacionales de Colombia, S. A. v. Hall, 466 U.S. 408, 414 n.9, 104 S. Ct. 1868, 80 L. Ed. 2d 404

28    (1984) (finding that whether a court is has general or specific jurisdiction over a non-resident

1    defendant turns on the nexus between the defendant's contacts with the forum and the facts and

2    claims pertinent to the litigation).

3         The Ninth Circuit applies a three-prong test to determine whether a court has specific

4    jurisdiction over a nonresident defendant: (1) the defendant must purposefully direct their activities

5    to the forum state, (2) the claim must be arising out of or related to these forum-related activities,

6    and (3) the exercise of jurisdiction must comport with fair play and substantial justice.

7    Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 799 (9th Cir. 2004).

8         Because Nev. Rev. Stat. section 14.065 permits Nevada courts to exercise jurisdiction to

9    the same extent as the Constitution, this Court need only consider the constitutional principles of

10   due process. Walden v. Fiore, 571 U.S. 277, 134 S. Ct. 1115, 1121, 188 L. Ed. 2d 12 (2014).

11        "Although the plaintiff cannot simply rest on the bare allegations of its complaint,

12   uncontroverted allegations in the complaint must be taken as true. Conflicts between parties over

13   statements contained in affidavits must be resolved in the plaintiff's favor." Schwarzenegger v,

14   374 F.3d at 799.  Even though it is the plaintiff's burden to prove personal jurisdiction, the District

15   Court may allow plaintiff to conduct jurisdictional discovery to uncover facts relevant to

16   establishing personal jurisdiction.  Boschetto v. Hansing, 539 F.3d 1011, 1015 (9th Cir. 2008);

17   Butcher's Union Local No. 498 v. SDC Invest., Inc., 788 F.2d 535, 540 (9th Cir. 1986) (finding

18   that trial courts have broad discretion to permit or deny jurisdictional discovery).

19        The plaintiff may meet her burden by submitting affidavits, declarations, and any pertinent

20   discovery materials.  Unless the Court conducts a discovery hearing, the plaintiff need only make

21   a *prima facie* showing of jurisdiction over the defendant to survive the motion to dismiss. Ranza

22   v. Nike, Inc., 793 F.3d 1059, 1068 (9th Cir. 2015).

23        **Temporary Restraining Order**

24        A temporary restraining order may be issued without notice to the adverse party only if the

25   moving party: (1) provides a sworn statement clearly demonstrating "that immediate and

26   irreparable injury, loss, or damage will result to the movant before the adverse party can be heard

27   in opposition," and (2) sets forth the efforts made to notify the opposing party and why notice

28   should not be required. Fed. R. Civ. P. 65(b)(1).

TROs issued without notice "are no doubt necessary in certain circumstances, but under federal law they should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." Reno Air Racing Ass'n v. McCord, 452 F.3d 1126, 1131 (9th Cir. 2006) (quoting Granny Goose Foods, Inc. v. Bhd. of Teamsters, 415 U.S. 423, 439 (1974)).

The analysis for a temporary restraining order is "substantially identical" to that of a preliminary injunction.  Stuhlbarg Intern. Sales Co, Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001).  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, a plaintiff must establish four elements: "(1) a likelihood of success on the merits, (2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that the public interest favors an injunction."  Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc., 758 F.3d 1069, 1071 (9th Cir. 2014), as amended (Mar. 11, 2014) (citing Winter, 555 U.S. 7, 20 (2008)).

A preliminary injunction may also issue under the "serious questions" test.  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134 (9th Cir. 2011) (affirming the continued viability of this doctrine post-Winter).  According to this test, a plaintiff can obtain a preliminary injunction by demonstrating "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," in addition to the other Winter elements.  Id. at 1134-35 (citation omitted).

## V.    DISCUSSION

As the Court finds it does not have jurisdiction over Defendant, the Court must dismiss this proceeding under Rule 12(b)(2) of the Federal Rules of Civil Procedure.  As the proceeding is dismissed, the TRO must be denied as moot.

/ / /

Plaintiff, across its filings before the Court, has raised multiple jurisdictional arguments. First, it argued that this court has specific jurisdiction over Defendant because has sufficient, targeted contacts with the Nevada. These alleged contacts include purchasing multiple vehicles here, meeting with the IML CEO in Nevada., and luring Nevada based IBOs or other IML clientele away from IML. The Court finds this argument woefully unpersuasive, and such conduct does not rise to the level of specific jurisdiction. These contacts appear scattered, most are unrelated to the facts from which this suit arises, and there are only three instances of contact, one of which is impermissibly vague. IML does not allege which IBOs, or how many, based in Nevada were "lured" away to competitors by Defendant, though such facts should be readily available.

Plaintiff's next argument was that Defendant expressly consented to jurisdiction in this state because he signed contracts containing a Nevada choice of law and choice of forum clause. Specifically, the version of the IBO agreements and agreements drafted in 2021 changed the choice of law and forum clause from New York to Nevada. Defendant was employed as an IBO until September 2021. The 2021 amended IBO agreements went into effect in June 2021. Therefore, Plaintiff argues that Defendant expressly consented to this Court's jurisdiction. Counsel for the parties communicated with one another and IML's Counsel confirmed that it did not have affirmative proof that Defendant signed these contracts or that he clicked a box to note his consent or acceptance of these new terms. ECF No. 56, Exh. A.

Plaintiff's current argument, first raised at the August 17, 2022 hearing, is that its contracts with IBOs contain unilateral amendment clauses; because Defendant was still an IBO with IML, when Plaintiff unilaterally amended the IBO agreements' choice of forum and choice of law clause from New York to Nevada, Defendant is squarely within the jurisdiction of this Court. Plaintiff develops this argument in its Response to Defendant's Motion to Dismiss, submitted after the August 17, 2022 hearing.

**A. 2017 IBO agreements**

Plaintiffs argue that in 2018, Defendant signed policies and procedures, terms and conditions, and other required documents that Plaintiff drafted in 2017 (the 2017 contracts). Plaintiff argues that the 2017 contracts contain a clause that allows it to unilaterally amend any

clause in the agreement "without prior notice as it deems appropriate." The 2017 amendment clause does list various ways that amendments will be "communicated" including "official Company notifications such as, but not limited to, posting on Company website. . . . ." The 2017 amendment clause does not require IML to provide any notice to IBOs who would be affected by a unilateral amendment to their contracts.

### B.  2019 Amended IBO Agreements

The contracts were unilaterally amended in 2019 ("2019 contracts").  As part of these changes, the amendment clause itself was rewritten as follows:

"IML reserves the right to amend the IML Agreement . . . in its sole and absolute discretion. Notification of amendments shall appear in all official IML materials, IML website, social media outlets or the IBO's back office . . . .[further, IML's amendments] shall be effective thirty (30) days following notice by one of the following methods: [1] Posting on the official IML website; [2] Electronic mail (e-mail); or [3] Any IML communication channels or social media outlets[.]"

### C.  2021 Amended IBO Agreements

In 2021, the IBO Agreements were unilaterally amended again.

The new amendment clause read as follows: "I acknowledge that IM fully reserves its right to amend or modify this IBO Agreement at any time by notifying me of the changes by emailing me or posting the revisions on the IM website (www.im.academy) or in the IM back office . . . ."

The choice of law and forum clause was amended from New York to Nevada, and specifically, suit would only be proper in federal or state court in "Clark County."

The 2021 Amended IBO Agreements also clarified that it superseded any prior or contemporaneous agreements between the IBO and Plaintiff.

### D.  Motion to Dismiss

Plaintiff argues that Defendant would have received notice of the 2021 amendments when the changes were "posted" to the company website, and specifically would be accessible on dashboards on webpages that Defendant and other IBOs frequented.  Plaintiff argues that because "IBOs are consistently on the website and should periodically check these terms as assented to[]" its  unilateral amendments are enforceable. The IBOs agreed to check the status of the terms of

1  their agreements with Plaintiff; failure to do so is a matter of responsibility.  Finally, Plaintiff

2  argues, via declaration of counsel, that Defendant was notified of the amended terms in a pop up

3  window when he logged on to the website.

4      Defendant argues that the matter should be dismissed because the unilateral amendments

5  do not provide adequate notice to the IBOs to be enforceable against them. Posting to the website

6  is inadequate, under Ninth Circuit precedent, and Plaintiff's argument that it operates an "internet-

7  based business" does not relieve it from the notice requirement. See Douglas v. U.S. Dist. Ct. for

8  Cent. Dist. of California, 495 F.3d 1062, 1065 (9th Cir. 2007) (per curiam); Stover v. Experian

9  Holdings, Inc., 978 F.3d 1082, 1084 (9th Cir. 2020).  Absent notice, these unilateral amendment

10  clauses render the parties' agreement illusory.

11      Additionally, Defendants note that the first time the Court saw the agreements Defendant

12  allegedly signed was as an exhibit to Plaintiff's last filing on this docket, ECF No. 55, its opposition

13  to Defendant's motion to dismiss. Defendants also note Plaintiff never argues or establishes that

14  the agreements allegedly signed, the 2017 IBO agreements, would have been offered to Defendant

15  in 2018, when he began his IBO relationship with Plaintiff.

16      This Court finds that it does not have personal jurisdiction over Defendant, because

17  Plaintiff cannot establish either that Defendant expressly consented to the amended terms any stage

18  across the life cycle of the parties' agreement, or that Defendant was properly notified of any

19  amendment.  As the forum and choice of clause was amended three years after the parties

20  commenced their business relationship, Plaintiff's failure to provide proper notice of the

21  amendment fatally dooms its Complaint in this case.

22      Online contracts usually occur either as "click wrap" agreements, where the non-drafting

23  party notes their assent to the terms of the contract by clicking a box stating they "agree" to the

24  terms and conditions provided, or "browsewrap" agreements, where a website's terms and

25  conditions of use are generally posted on the website via a hyperlink at the bottom of the screen.

26  Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1175-76 (9th Cir. 2014).

27      The Ninth Circuit requires notice to the nondrafting party for any unilateral amendments

28  to online contracts (presumably by the drafting party). See Douglas v. U.S. Dist. Ct. for Cent. Dist.

of California, 495 F.3d 1062, 1065 (9th Cir. 2007) (per curiam).  Here, the facts parallel those in Stover.  978 F.3d at 1086l.  The contract was a hybrid: Plaintiff alleges in its Complaint that IBOs "click boxes" certifying that they agree to comply with all listed terms in the original agreements they enter into with Plaintiff, and that Defendant did so here.  Subsequent amended contracts appear "uploaded to the website," like browsewrap agreements.  See Stover, 978 F.3d at 1086. The Ninth Circuit found that the unilaterally changed terms on a credit reporting agency's website were "unenforceable due to a lack of notice: even if the [nondrafting party] visited the website where the new contract was posted." Id.  Plaintiff argues IBOs' use of Plaintiff's website required frequent visits to the pages where the amended terms could be viewed, and that as an IBO, Defendant further agreed to stay up to date with the terms and conditions.  Under the Stover analysis, however, the inquiry is not how often the nondrafting party would log on to a company's webpage, but rather whether the drafting party properly notified the plaintiff of any revisions to its contract terms.  Id.

Stover contemplates Plaintiff's argument here, that a different rule should apply to online businesses; instead, it cautions that an "absence of limits on the frequency or substance of changes in terms subverts the basic rule of contract law that '[a] contract exists where the parties assent to the same thing in the same sense, so that their minds meet.'" Id. (internal citations omitted).  In its pleadings and briefings before the Court, Plaintiff cannot show either that Defendant expressly consented to a change of forum and choice of laws clause in June 2021, or that he was on sufficient notice of the unilateral amendment posted to Plaintiff's website. Douglas, 495 F.3d at 1066 ("[p]arties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side.").  Although Plaintiff's 2017 IBO agreements do not contemplate notice for unilateral changes, subsequent amendments do; Plaintiff maintains in all its briefing, however, that it only posted any unilaterally modified or amended term to its website and that this alone is sufficient notice.  The Court finds that it is not, and that the 2021 forum and choice of law clause does not cover Defendant because he had no meaningful opportunity to assent to it.

/ / /

**Temporary Restraining Order**

In determining that the Court does not have jurisdiction over this case, the Court finds that it may not address Plaintiff's pending TRO.  Were Plaintiff to file any suit against Defendant in the appropriate forum, it may decide to reassert any applicable claims for injunctive relief.

**Leave to Amend**

When granting a motion to dismiss, courts are generally encouraged to grant leave to amend if amendment would not be futile. Eminence Capital, LLC v. Aspeon LLC, 316 F.3d 1048, 1051-52 (9th Cir. 2003).  Here, allowing amendment would be futile, as this Court does not have jurisdiction over Defendant.

## VI.    CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Matthew Thayer's Motion to Dismiss (ECF No. 45) is granted; Plaintiff's Temporary Restraining Order (ECF No. 42) is denied as moot. This matter is dismissed with prejudice.   The Clerk of the Court is instructed to close this case.

DATED: September 16, 2022.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**